Global Capital Law, PC
Gary Harre, CBN# 86938
Diane Beall, CBN# 86877
Barry Fagan, CBN 160104
17612 Beach Blvd, Ste 8
Huntington Beach, CA 92647
Telephone: (714) 907-4182
Email: ghcmecf@gmail.com

Attorney for Debtor
FERMIN CANLAS

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re                  )    **Case No. 2:10-bk-55468-TD**

      FERMIN CANLAS      )    **ADV. NO. 2:11-ap-01126-TD**

_____ )

FERMIN CANLAS, an Individual   )

            Plaintiff,     )

-vs.-                   )

U.S. BANK NATIONAL ASSOCIATION, AS )
TRUSTEE OF MAIDEN LANE ASSET- )
BACKED SECURITIES I TRUST 2008-1, )
WITHOUT RECOURSE SUCCESSOR )
LENDER BY MESNE TRANSFER FROM )
MORTGAGE ELECTRONIC )
REGISTRATION SYSTEMS, INC., AS )
NOMINEE FOR GREENPOINT MORTGAGE )
FUNDING, INC., A NEW YORK )
CORPORATION; AZTEC FORECLOSURE )
CORPORATION; MORTGAGE )
ELECTRONIC REGISTRATION SYSTEMS, )
INC. (MERS); and all persons claiming by, )
through, or under such person, all persons )
unknown, claiming any legal or equitable right, )
title, estate, lien, or interest in the property )
described in the complaint adverse to Plaintiff's )
title thereto; and DOES 1-100, Inclusive; )

            Defendant. )

_____

**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION.**

//

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD, STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to Federal Rules of Civil Procedure ("FRCP"), Rule 65(b) and local Rule L.R. 65-1, Plaintiff FERMIN CANLAS ("CANLAS") hereby apply ex parte to this Court for:

1.    A Temporary Restraining Order ("TRO") restraining and enjoining Defendant U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE OF MAIDEN LANE ASSET-BACKED SECURITIES I TRUST 2008-1, WITHOUT RECOURSE SUCCESSOR LENDER BY MESNE TRANSFER FROM MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., ("US BANK") and all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privities with any of them, from taking possession of Plaintiff's property known as 212 Gladys Avenue, Monterey Park, California (hereinafter "Plaintiff's Home") together with detached garage and separate structures, if any.

2.    Plaintiff will apply for an Order to Show Cause ("OSC") as to why a Preliminary Injunction should not be granted enjoining Defendants US BANK, their agents, employees, representatives, attorneys, and all persons acting in concert or participating with them from taking possession of Plaintiff's home located at 212 Gladys Avenue, Monterey Park, California.

3.    Concurrently, Plaintiff hereby applies for a hearing date to obtain a Preliminary Injunction.

This Application is based on the grounds that pecuniary compensation would not afford adequate relief for the loss of possession of Plaintiff's home. Defendant, who was a stranger to this mortgage transaction, is seeking to take possession based on fraudulent conveyance via Trustee's Deed recorded with Los Angeles County Recorder as instrument number 20071868558.

On or about October 18, 2010 Plaintiff's property was allegedly sold by Aztec Foreclosure Corporation by way of a trustee's sale.

On information and belief and thereon, Plaintiff alleges that such sale never took place and Defendant Aztec manufactured and recorded a forged Trustee's Deed.

US Bank has purchased Plaintiff's home at an alleged Trustee's Sale without making payment for such purchase. Furthermore, the Trustee Sale was conducted without Plaintiff's knowledge which is in violation of the rights of Plaintiff, which is the subject of this action. Great and irreparable injury will result to Plaintiff before the matter can be heard on notice.

Plaintiff has not previously obtained an order from any judicial officer for similar relief in this case.

The Application is based upon this notice, the Complaint on file, the attached Memorandum of Points and Authorities, the Declarations of CANLAS, and any oral argument which will be heard at the time of the hearing of this matter.

DATED: 2/1/2011                              Respectfully Submitted;

GARY HARRE, ESQ. (BAR NO. 86398)
DIANE BEALL, ESQ. (BAR NO. 86877)
BARRY FAGAN, ESQ. (BAR NO. 160104)
Attorneys for Plaintiff, FERMIN CANLAS

GARY HARRE, ESQ. (BAR NO. 86398)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, S.P.C.
17612 BEACH BLVD, STE 8
HUNTINGTON BEACH, CA 634-3842
TELEPHONE: (714) 634-3842

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff CANLAS brings this adversary action against US Bank; Aztec Foreclosure Corporation; and Mortgage Electronic Registration Systems, Inc. (MERS); (hereinafter "Defendants") and their agents, officers, employees, and affiliated or associated parties, for their and their predecessors actions in engaging in a pattern of unlawful, fraudulent, or unfair predatory real estate practices causing Plaintiff to become a victim of such behavior, and to be in jeopardy of losing his home through foreclosure.

Plaintiff seeks to enjoin defendants from proceeding with taking possession and evicting him, his children and grandchildren from their home located at 212 Gladys Avenue, Monterey Park, California.

On October 21, 2010, the Plaintiff CANLAS filed a bankruptcy under Chapter 7 of the U.S. Bankruptcy Code after which an Automatic Stay was put into place.  The Court granted such motion because of the summary nature of proceeding.  Based on the Court's opinion, Plaintiff brings this instant motion to restrain Defendant US Bank from taking possession and evicting Plaintiff, along with his children and grandchildren from their home.

## II.    STATEMENT OF FACTS

Plaintiff CANLAS obtained a mortgage financing his home with GreenPoint Mortgage Funding, Inc. on or about July 30, 2007.  Such loan is evidence by a Promissory Note in favor of GreenPoint Mortgage Funding, Inc.  A true and correct copy of the Promissory Note is attached herewith as **Exhibit 1**.  Such Promissory Note is secured by a Deed of Trust with Marin Conveyancing Corp. as Trustee, GreenPoint Mortgage Funding, Inc. as lender, and MERS or Mortgage Electronic Registration Systems, Inc., *"a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the***

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

***beneficiary under this Security*** Instrument." A true and correct copy of the Deed of Trust is attached herewith as **Exhibit 2**.

Plaintiff is informed and believes and therefore alleges that GreenPoint Mortgage Funding Inc. ("hereinafter, "Greenpoint") represented to Plaintiff that it was the originator of the subject loan ("hereinafter, "the Greenpoint Loan""), with loan number 0092684091, through a table funding on or about July 30, 2007.

Plaintiff is informed and believes and therefore alleges that Greenpoint falsely represented that they were funding the note. This was not the case, as the funds came from another source. The indebtedness to this note remains uncertain. Plaintiff has not seen the original note since signing and its whereabouts or existence is unknown.

Plaintiff is informed and believes and therefore alleged that EMC Mortgage Corp. ("EMC") never received beneficial interest in the promissory note and the Deed of Trust as security instrument for such obligation.  In fact, public records from Los Angeles County Recorder did not indicate any assignment of such beneficial interest from Greenpoint to EMC.

Plaintiff is informed and believes and therefore alleged that on or about May 15, 2009 "MERS" as nominee for EMC Mortgage Corporation, who is not the party to this subject transaction, recorded a Substitution of Trustee, document number 09-0723180 purportedly substituted Aztec Foreclosure Corp. as trustee under the subject deed of trust.

On or about June 8, 2010 Aztec Foreclosure Corporation with power of sale fraudulently obtained by virtue of substitution of trustee made by MERS, recorded Notice of Trustee Sale with Los Angeles Country Recorder as Instrument number 09-507950.

On or about October 18, 2010, Plaintiff's property was allegedly sold by Aztec Foreclosure Corporation by way of a trustee's sale.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

On information and belief and thereon, Plaintiff alleges that such sale never took place and Defendant Aztec manufactured and recorded a forged Trustee's Deed.

On or about October 21, 2010, Plaintiff filed Chapter 7 Bankruptcy Petition under case # 2:10-bk-55468-TD, seeking protection from the pending Trustee Sale.

On October 25, 2010, a "Wild Deed Instrument" was recorded by MERS as nominee for that EMC Mortgage Corp. ("EMC"), who is not a party to this transaction, as instrument number 2010-1521738, purportedly assigned its non-existent beneficial interests to US Bank National Association as trustee Maiden Lane Asset Backed Securities' I Trust 2008-1.

The entity US bank, as Trustee, has no pecuniary interest in the mortgage loan. The foreclosing entity is a third party receiving interest from MERS, who has no beneficial interest to assign. US Bank, as Trustee, lacked the standing and the capacity to foreclose and had no beneficial interest to make credit bid. MERS, as nominee, having no beneficial interest in the Promissory Note, would have no legal authority to draft any mortgage assignments nor to substitute a trustee. The foreclosing entity and its agents regularly commit perjury in relation to their testimony.

Greenpoint, the "Lender", on the original Promissory Note was not the lender. The originators of the loan immediately and simultaneously securitized the note. The beneficial interest in the note was never in the lender. In this case, MERS, acting as nominee for Greenpoint under the Deed of Trust, was never intended to be the beneficiary of the mortgage loan.

MERS had no beneficial interest in the subject Note, had never held the Note, had no agency authority to convey an interest in the Note and, as such, any attempt made by MERS to transfer the ownership of the Note is void. The

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

mortgage loan assigned to MERS, as nominee, is at most, an unsecured debt. The only parties entitled to collect on the unsecured debt would be the holders in due course and beneficial owners of the original Promissory Note.

Defendant, US BANK, representing itself as a trustee of a "Trust" coming to Court, is actually a special purpose vehicle consolidated by the Federal Reserve Bank of New York ("FRBNY"). The Servicers, like EMC, and trustee, like US Bank, are merely administrative entities which collect the mortgage payments and escrow funds.

Importantly, US Bank, as "Trustee" of a special purpose vehicle consolidated by the Federal Reserve Bank of New York, cannot receive ownership interest in the Promissory Note in contrary to terms set up by the FRBNY.

Consequently, US Bank lacked the power to acquire or take assignment of any mortgage outside of the terms and conditions of Maiden Lane Trust. An attempted assignment or ownership of the Note is a "Prohibited Transaction".

As such, the Assignment, dated October 25, 2010, is ultra vires. In this scenario, even if the foreclosing entity produces a copy of a note, or even an alleged original, the mortgage loan cannot be conveyed to US Bank as a trustee.

Plaintiff signed a Promissory Note and Mortgage; they were unknowingly converting their property into an asset of a Mortgage-Backed Security (MBS) prior to being taken over by the FRBNY. Plaintiff was never informed of the nature of the scheme. They were deliberately induced into signing a Negotiable Instrument which was never intended as such, but as intended as collateral for a MBS.

The fact that this loan was meant to fund a failed MBS was a "material disclosure" which was deliberately and intentionally undisclosed. The failure to disclose the identity of the true lender at closing was also a "material disclosure"; the nature of which would make the contract voidable under California contract law.

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
RE: PRELIMINARY INJUNCTION

III.  **APPLICABLE AUTHORITIES**

Federal Rule of Civil Procedure 65 and Local Rule 65-1 authorize this Court to enter a Preliminary Injunction or Temporary Restraining Order ("TRO"). *See* Fed.R. Civ.P § 65. The purpose of such injunctive relief is to preserve the relative positions of the parties until a trial on the merits can be conducted. *See* E. & J. Gallo Winery v. Andina Licores S.A., 446 F.3d 984, 990 (9th Cir. 2006); LGS Architects, Inc. v. Concordia Homes, 434 F.3d 1150, 1158 (9th Cir. 2006).

A party seeking a Preliminary Injunction must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. Faith Ctr. Church Evangelistic Ministries v. Glover, 462 F.3d 1194, 1201-02 (9th Cir. 2006). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. LGS Architects, 434 F.3d at 1155; see also Harper v. Poway Unified Sch. Dist., 445 F.3d 1166, 1174 (9th Cir. 2006) (the greater the relative hardship to the moving party, the less the probability of success must be shown to support the grant of a preliminary injunction).

In addition, the party must do more than merely allege imminent harm sufficient to establish standing, he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. Associated Gen. Contractors v. Coalition for Economic Equity, 950 F.2d 1401, 1410 (9th Cir. 1991), cert. denied, 503 U.S. 985 (1992).

Under the sliding scale theory, a party seeking an injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation." Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1528 (9th Cir. 1993), cert. denied, 511 U.S. 1030 (1994). Additionally, in cases where the public interest may be

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, SP.C.
17612 BEACH BLVD, STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

affected, the court must consider the public interest as a factor in balancing the hardships. <u>Harris v. Bd. Of Supervisors</u>, 366 F.3d 754, 760 (9th Cir. 2004).

While a Preliminary Injunction will not be issued without security by the applicant under Federal Rule of Civil Procedure 65(c), a district court has wide discretion in setting the amount of a bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction. *See,* <u>Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,</u> 321 F.3d 878, 882 (9th Cir. 2003).

## IV.    ARGUMENTS

Plaintiff's operative pleadings, filed on January 14, 2011, asserts claims for TILA violation, quiet title, cancellation of Trustee's Deed and damages.

### 1.    Probability of Success on the Merits

Plaintiffs can demonstrate high probable successes on the merits on their claims for relief of cancellation of Trustee's Deed and their Truth in Lending Act claim.

#### a.    Cancellation of Trustee's Deed upon Sale.

Strong showing is made that US Bank was not a beneficiary under the Deed of Trust and Aztec Foreclosure Corporation was not a trustee with power of sale under the Deed of Trust.    US Bank does not have the right to enforce the subject debt in the first place, much less to purchase it under credit bid.

In this case, transfer of mortgage paper may be made outright (sale) or by pledge (as security for a loan to the transferor).  In any event, to perfect the transfer, the transferor should physically deliver the Note to the transferee.  Without a physical transfer, a sale of the Note could be invalidated as a fraudulent conveyance under <u>Com. Code</u> §3440, and a transfer in pledge could be invalidated as an unperfected under <u>Com.</u>Code

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
RE: PRELIMINARY INJUNCTION

§ § 9313-9314. *See* <u>California Mortgages and Deed of Trust, and Foreclosure Litigation</u>, by Roger Bernhardt, Fourth Edition, section 1.26.

Here, all that US Bank has in its possession is a copy of a Trustee's Deed, which stated that it was the Grantee who was the foreclosing beneficiary under the Deed of Trust.   No other evidence can be found in public record that US Bank was the beneficiary of the original Note and Deed of Trust.  The Note and Deed of Trust, as included, run in favor of GreenPoint Mortgage Funding, Inc and no assignment of Deed of Trust ever recorded assigned beneficial interest to US Bank, or to anyone else for that matter.

There is no authority (and Plaintiff is aware of none) for the apparent proposition that transfer of the Deed of Trust without assignment, let alone recordation, is sufficient to give US Bank a security interest in the Property as beneficiary.  As it stands on the record, the Trustee's Deed with US Bank, as beneficiary, foreclosing on the Deed of Trust, by way of Credit Bid, constitutes fraudulent transfer.  Nothing in the Deed of Trust, as written or in the way in which it has been handled, gives any indication that US Bank has any security interest as beneficiary in the Property.  Not surprisingly therefore, US Bank focuses the Court's attention on the Trustee's Deed.

California <u>Civil Code</u> § 2932.5 provides:

Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded.

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

Plaintiff is aware of no California case law interpreting this section. However, it appears to indicate that a security interest runs with the obligation that is as assignment of the Note amounts to an assignment of the Deed of Trust.  However, the Promissory Note contained no endorsement to anyone. Furthermore, MERS was not named anywhere in the Promissory Note and could not conceivably assign the Note to US Bank.

**b.    Truth in Lending Act.**

In addition, Plaintiff shows a high probable success on the merits of his claims brought under the Truth in Lending Act (TILA). "The TILA was enacted by Congress to 'avoid the uninformed use of credit.'" Jackson v. Grant, 890 F.2d 118, 120 (9th Cir. 1989). To effectuate this purpose, "[e]ven technical or minor violations of the TILA impose liability on the creditor." Id. (citing Semar v. Platte Valley Fed. Sav. & Loan Ass'n, 791 F.2d 699, 704 (9th Cir. 1986)). Thus, the Ninth Circuit has held that the TILA and accompanying regulations must be "absolutely complied with and strictly enforced."

Applicable here, section 125(a) of the TILA, 15 U.S.C. § 1641 was amended by adding at the end the following:

"(g) NOTICE OF NEW CREDITOR.-
(1) IN GENERAL.- In addition to other disclosures required by this title, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including-
(A)  the identity, address, telephone number of the new creditor;
(B)  the date of transfer;
(C)  how to reach an agent or party having authority to act on behalf of the new creditor;
(D)  the location of the place where transfer of ownership of the debt is recorded; and

(E)  any other relevant information regarding the new creditor

From the record, it appears that US Bank cannot become a creditor or assignee of the Deed of Trust.  Therefore, any assertion made by US Bank as beneficiary, whether as creditor under the Promissory Note or beneficiary under the Deed of Trust, cannot legally occur.

**2.      Irreparable Harm.**

Plaintiff maintains he will be irreparably harmed by loosing possession of his family home.  In <u>Wrobel v. S.L. Pope & Associates</u>, 2007 WL 2345036, at *1 (S.D. Cal. 2007), the court found that **"[l]osing one's home through foreclosure is an irreparable injury."** Similar findings were made by the courts in <u>Johnson v. U.S. Department of Agriculture</u>, 734 F.2d 774, 789 (11th Cir. 1984) **("irreparable injury is suffered when one is wrongfully ejected from his home. Real property and especially a home is unique"**); <u>Cronkhite v. Kemp</u>, 714 F. Supp. 822, 825 (E.D. Wash. 1989).

One court denied a Temporary Restraining Order on a foreclosure, reasoning that the TRO applicant could halt foreclosure by paying the amount due on the loan. *See* <u>Barrett v. Popular Inc.</u>, 2007 WL 1753539, at *1 (W.D. Wash. 2007). But in this case, the validity of the Trustee's Deed itself is the heart of the dispute. The Court therefore should be persuaded that Plaintiff will be irreparably harmed by loosing possession of his home.

**3.      Bond.**

While the literal language of Federal Rule of Civil Procedure 65(c) suggests that a restraining order will not be issued without security by the applicant, a district court has wide discretion in setting the amount of a bond. *See* <u>Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills</u>, 321 F.3d 878, 882 (9th Cir. 2003). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining

GARY HARRE, ESQ. (BAR NO. 86938)
GLOBAL CAPITAL LAW, P.C.
17612 BEACH BLVD., STE 8
HUNTINGTON BEACH, CA 92647
TELEPHONE: (714) 634-3842

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE
RE: PRELIMINARY INJUNCTION

his or her conduct." <u>Joregensen v. Cassidy</u>, 320 F.3d 906, 919 (9th Cir. 2003). Here there is no realistic harm to the defendant from a temporary restraint of the foreclosure proceedings. If the defendants' position that the Trustee's Deed is valid, then Defendant can take possession, as no transfer can take place. The defendant's interests are adequately secured by the Trustee's Deed if it is valid. No bond will be required at this time.

**CONCLUSION**

Accordingly, plaintiff prays the Court to grant his *Ex Parte* application for a Temporary Restraining Order and Order to Show Cause enjoining Defendants from taking possession and evict Plaintiff and his children as well as his grandchildren from their home located at 212 Gladys Avenue, Monterey Park, California, until the Preliminary Injunction hearing.

Plaintiff further requests this Court to set a hearing date for Preliminary Injunction.

Dated: 2/1/2011                    Respectfully Submitted;

Gary Harre, Esq.
Attorney for Plaintiff, FERMIN CANLAS

NOTICE OF APPLICATION AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

# ADJUSTABLE RATE NOTE

**(LIBOR Six-Month (As Published In The Wall Street Journal) – Rate Caps)**

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN $668,250.00. THE INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

| July 30, 2007 | Las Vegas | Nevada |
|---|---|---|
| (Date) | (City) | (State) |

212 Gladys Avenue, Monterey Park, CA  91755
(Property Address)

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $607,500.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc. I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.625%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

**(A)    Time and Place of Payments**

I will make my monthly payments on the first day of each month beginning on September 1, 2007. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal, if any. If, on August 1, 2037, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 79363, City of Industry, CA 91716-9363, or at a different place if required by the Note holder.

0092684091

**Exhibit 1**

(B)    **Amount of My Monthly Payments**

Each of my monthly payments will be in the amount of U.S. $2,341.41 (the "Minimum Payment") every month (i) for the first 60 month(s), or (ii) until payment of the Minimum Payment on my next scheduled payment date would cause my principal balance to exceed the Maximum Limit set forth in section 3(D), whichever event occurs first (the "Option Period"). The Minimum Payment is calculated based upon the amount of interest that will accrue each month at a rate equal to 4.625%. Payment of the Minimum Payment amount will result in accrued but unpaid interest being added to Principal. The unpaid Principal and any accrued but unpaid interest will then accrue additional interest at the rate then in effect. This practice is known as negative amortization.

After the expiration of the Option Period and through the first 120 scheduled payments, my monthly payments will be in an amount sufficient to pay accrued interest at the rate determined as described in Section 4 of this Note (the "Interest Only Period"). In addition, if I make payments of principal and/or accrued unpaid interest during the Interest Only Period, my monthly interest-only payment amount will change and will be based on the remaining Principal and my then current interest rate.

After the expiration of the Interest Only Period, I will pay principal and interest by making payments every month for the remaining term (the "Full Amortization Period"). The amount of payments during the Full Amortization Period will be determined by the Note Holder as set forth in Section 4.

(C)    **Additions to My Unpaid Principal**

During the Option Period, my Minimum Payment could be less than or greater than the amount of interest owed each month. For each month that my Minimum Payment is less than the interest owed, the Note Holder will subtract the amount of my Minimum Payment from the amount of the interest portion and will add the difference to my unpaid Principal. Interest will accrue on the amount of this difference at the interest rate required by Section 2 or Section 4. For each month that the Minimum Payment is greater than the interest portion, the Note Holder will apply the payment to interest before Principal.

(D)    **Limit on My Unpaid Principal; Increased Minimum Payment**

My unpaid Principal can never exceed the Maximum Limit equal to 110% of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to additions to my unpaid Principal described in Section 3(C). If on any payment due date I would exceed the Maximum Limit by paying my Minimum Payment, then my monthly payment will be adjusted to an amount equal to the Interest Only Payment described in Section 3(E)(i). I will continue to pay that amount until the Interest Only Period expires.

(E)    **Additional Payment Options**

During the Option Period, the Note Holder may provide me with up to two (2) additional payment options (the "Payment Options"). I will be eligible to select one of the Payment Options if it results in a larger monthly payment than my regular Minimum Payment. I may be given the following Payment Options:

(i) Interest Only Payment: Pay only the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) Fully Amortized Payment: Pay the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments, at the then current interest rate.

0092684091

Hybrid Option ARM Note
GreenPoint Mortgage Funding, Inc.                    Page 2 of 7                          HYBOANMU (07/07)

**Exhibit 1**

These Payment Options are only applicable if they are greater than the Minimum Payment.

    (F)    **Notice of Changes**

The Note Holder will deliver or mail to me notice of any changes in my Minimum Payment before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

    (G)    **Date of First Payment and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Due Date") shall be that date which is ten year(s) from the first payment due date, as reflected in Section 3(A) of the Note.

    **4.    ADJUSTABLE INTEREST RATE**

    **(A) Interest Rate Change Dates**

The initial interest rate I will pay may change on the first day of **August, 2012,** and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my interest rate may change is called an "Interest Rate Change Date."

    **(B) The Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent index figure available as of the date 45 days before each Interest Rate Change Date is called the "Current Index."

If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

    **(C) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding two and three-quarters percentage points (2.750%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below this rounded amount will be my new interest rate until the next Interest Rate Change Date.

The Note Holder will then determine the amount of the monthly payment. When the Interest Rate Change Date occurs during the Interest Only Period, the new monthly interest-only payment will be based on the unpaid Principal that I am expected to owe at the Interest Rate Change Date and my new interest rate. If the Interest Rate Change Date occurs during the Full Amortization Period, my new monthly payment will be in an amount sufficient to repay the unpaid Principal that I am expected to owe at the Interest Rate Change Date at my new interest rate in substantially equal payments.

0092684091

**Exhibit 1**

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Interest Rate Change Date will not be greater than 12.625% or less than 2.750%. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than 1.000% from the rate of interest I have been paying for the preceding six (6) months. My interest rate will never be greater than 12.625%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**5.     BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayment without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the Interest Only Period, my monthly interest-only payment will change and will be based on the remaining Principal and my then current interest rate. If the partial Prepayment is made during the Option Period or the Full Amortization Period, my partial Prepayment may reduce the amount of my monthly payments after the first Interest Rate Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.     LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.     BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

0092684091

**Exhibit 1**

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, it also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

0092684091

**Exhibit 1**

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)    Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest In Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)    When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest In Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

0092684091

**Exhibit 1**

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is mailed or delivered within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Borrower)        _____ (Borrower)
Fermin Canlas

_____ (Borrower)        _____ (Borrower)

_____ (Borrower)        _____ (Borrower)

_____ (Borrower)        _____ (Borrower)

0092684091

Hybrid Option ARM Note
GreenPoint Mortgage Funding, Inc.                Page 7 of 7                HYBOANMU (07/06)

**Exhibit 1**

Recording Requested By:
GreenPoint Mortgage Funding,
Inc.
Return To:
GreenPoint Mortgage Funding,
Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049


Prepared By:
GreenPoint Mortgage Funding,
Inc.
100 Wood Hollow Drive,
Novato, CA 94945

*07-06-125721 M* —————————[Space Above This Line For Recording Data]—————————

# DEED OF TRUST

MIN 100013800926840915


## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated July 30, 2007
together with all Riders to this document.
(B) "Borrower" is Fermin  Canlas, A Married Man as his sole and separate
property


Borrower's address is 212 Gladys Avenue, Monterey Park, CA 91755
. Borrower is the trustor under this Security Instrument.
(C) "Lender" is GreenPoint Mortgage Funding, Inc.

Lender is a Corporation
organized and existing under the laws of the State of New York

4091

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3005  1/01

-6A(CA) (0207).01
Page 1 of 15
        VMP Mortgage Forms, Inc.
Customized by GreenPoint Mortgage Funding, Inc.

**Exhibit 2**

Lender's address is 100 Wood Hollow Drive, Novato, CA 94945

(D) "Trustee" is Marin Conveyancing Corp.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated July 30, 2007
The Note states that Borrower owes Lender six hundred seven thousand five hundred and 00/100                                                                                          Dollars
(U.S. $ 607,500.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2037

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [x] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [x] Occupancy Rider | [ ] Interim Interest Rider | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

4091

-6A(CA) (0207).01                          Page 2 of 15                          Form 3005  1/01

**Exhibit 2**

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Los Angeles | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

As more particularly described in exhibit "A" attached hereto and made a part hereof.

Parcel ID Number: 5258-005-099                          which currently has the address of

212 Gladys Avenue                                                                 [Street]

Monterey Park                            [City], California 91755            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

4091

-6A(CA) (0207).01                          Page 3 of 15                          Form 3005   1/01

**Exhibit 2**

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0207).01                    Page 4 of 15                    Form 3005   1/01

**Exhibit 2**

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

**Exhibit 2**

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

4091

-6A(CA) (0207).01    Page 6 of 15    Form 3005    1/01

**Exhibit 2**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

4091

**Exhibit 2**

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

4091

VMP®-6A(CA) (0207).01          Page 8 of 15          Form 3005   1/01

**Exhibit 2**

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

4091

**Exhibit 2**

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

4091

 -6A(CA) (0207)01                        Page 10 of 15                        Form 3005  1/01

**Exhibit 2**

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

4091

-6A(CA) (0207).01                        Page 11 of 15                        Form 3005    1/01

**Exhibit 2**

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

4091

 -6A(CA) (0207).01                     Page 12 of 15                     Form 3005    1/01

**Exhibit 2**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

4091

**Exhibit 2**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
Fermin Canlas                       -Borrower

_____

_____ (Seal)
                                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                                    -Borrower

4091

-SA(CA) (0207).01              Page 14 of 15              Form 3005   1/01

**Exhibit 2**

State of California
County of _____    } ss.

On _July 31, 2007_ before me, _Liza P. Murillo_    personally appeared

**Fermin Canlas**

_____, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Liza P. Murillo_    (Seal)

LIZA P. MURILLO
Notary Public, State of Nevada
Appointment No. 04931201
My Appt. Expires Nov. 8, 2008

4091

-6A(CA) (0207).01    Page 15 of 15    Form 3005    1/01

**Exhibit 2**

EXHIBIT "A"

A CONDOMINIUM COMPRISED OF:

PARCEL 1:

AN UNDIVIDED 1/4 INTEREST IN AND TO PARCEL 1 OF PARCEL MAP NO. 24703, IN THE CITY OF
MONTEREY PARK, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK
282 PAGE(S) 15 AND 16 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

EXCEPT THEREFROM CONDOMINIUM UNITS 1 TO 4 INCLUSIVE, AS SHOWN AND DEFINED UPON THE
CONDOMINIUM PLAN RECORDED AUGUST 13, 1998 AS INSTRUMENT NO. 98-1427409, OFFICIAL
RECORDS OF SAID COUNTY.

PARCEL 2:

UNIT 4, AS SHOWN UPON THE CONDOMINIUM PLAN REFERRED TO IN PARCEL 1 ABOVE.

**Exhibit 2**